**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jaime Perez Munoz,<br><br>    Petitioner,<br><br>vs.<br><br>Charles L. Ryan, et al.,<br><br>    Respondents. | No. CV-13-0413-PHX-GMS (DKD)<br><br>**REPORT AND RECOMMENDATION** |

TO THE HONORABLE G. MURRAY SNOW, UNITED STATES DISTRICT JUDGE:

      Jaime Perez Munoz filed a timely Petition for Writ of Habeas Corpus on February 26, 2013, challenging his convictions in Maricopa County Superior Court following a jury trial for one count of kidnapping, two counts of attempted sexual assault, one count of sexual assault, and the imposition of concurrent prison terms, the longest being 7 years, followed by lifetime probation. He raises three grounds for habeas relief: (1) the prosecutor engaged in misconduct by failing to subpoena the victim for trial, by misleading counsel and the trial court as to the victim's whereabouts, and by offering false testimony; (2) Munoz received the ineffective assistance of counsel during critical stages of his trial proceedings; and (3) the trial court lacked subject matter jurisdiction when the indictment was filed, in violation of his due process rights. Respondents contend that Grounds One and Three are unexhausted and procedurally defaulted, and that Ground Two is without merit. The Court agrees and recommends that the petition be denied and dismissed with prejudice.

**BACKGROUND**

The facts supporting the convictions are summarized in the court of appeals memorandum decision:

> The victim, a Spanish-only speaker, lived with Appellant, her adult son, in a Phoenix apartment. Sometime after 1:00 a.m. on March 23, 2008, Appellant approached his mother as she exited the shower, "gagged" her by placing his hand over her mouth, pushed her to the floor, and told her not to say anything or he would hit her. He then tried to penetrate her vagina with his penis but could not do so. He next placed his penis in her mouth, and when she tried to get up, he pushed her back down. He tried again to put his penis inside her vagina, but was incapable of getting it past her vulva because he could not get an erection. The victim ultimately escaped from the apartment by pushing a screen out of a bedroom window.
>
> Shortly thereafter, Ernie S., who also lived in the apartment complex, was returning home when he noticed the victim attempting to communicate with a neighbor who spoke no Spanish. He could tell by the victim's face that something was wrong because she looked "terrified. She just looked very, very scared." When the victim saw him, she said "ayuda," meaning "help" in Spanish. He told her that he spoke Spanish, and the victim "seemed to kind of cool down" or at least not get worse "because she finally found somebody to help her."
>
> Speaking in Spanish, the victim exclaimed, "My son just raped me." She was still "unbelievably frightened" and "would like duck after she would hear any sound, and . . . would say, 'Is that him?'" Ernie S. offered to call the police or security, but the victim informed him that she did not wish to do so "because it's my son." Instead, she used his telephone to call her employer and her niece before asking Ernie S. if he would drive her to her niece's house. As he drove, the victim, who was crying hysterically, made many statements, including: "I can't believe he did this to me. He's never done anything like this before. He--I mean he's never disrespected me."
>
> When they arrived at her niece's house, the victim requested that Ernie S. accompany her to the front door because she was afraid to walk there on her own. Her niece testified at trial that the victim was very upset, scared, and crying, but she eventually managed to "open up" and explain what had happened. The victim's niece's husband called the police.
>
> A Phoenix police detective interviewed the victim later that morning. During the interview, the victim constantly used tissues to wipe her mouth. The detective noticed injuries on the victim's face, the side of her nose, her mouth and lip, and her right shoulder. The detective subsequently arranged a

- 2 -

confrontation call between the victim and Appellant, using the assistance of a Spanish-speaking officer. Because the victim was still very upset, however, the confrontation call proved difficult. The victim would speak rapidly and often ask one question after the other without permitting Appellant to respond. Further, most of Appellant's responses during the telephone call were "vague." Appellant neither admitted nor denied the allegations his mother made; instead, he often responded with silence or took a long time to respond - and then only stated that he had "psychological problems" or "had too much to drink" or thought he "was dreaming." At one point, Appellant stated that he was not aware of what he was doing until he "woke up" and saw the expression on his mother's face.

During the call, the victim asked Appellant how he thought she felt. Appellant replied, "I already feel like a dog." He stated that he wanted her to call the police and he would wait for them at his apartment. When the victim asked why she should call the police, Appellant replied, "I deserve to go to jail."

After the confrontation call, Appellant called his ex-wife and informed her that he had done "something wrong" to his mother. When questioned if he had hit her, Appellant stated, "I did something worse." After Appellant hung up the phone, his ex-wife became concerned because he sounded "so depressed." She was in the midst of a conversation with a suicide line when Appellant called back and informed her that the police were there, he had a knife, and he was going to kill himself. He then hung up the phone.

Appellant was on the balcony of his apartment when police officers arrived. He then went inside the apartment and announced that he had a knife and planned to kill himself. Nonetheless, officers were able to arrest Appellant after making a forced entry into the apartment. While there, they noticed that a screen had been removed from a window and was lying on the bed.

The detective interviewed Appellant at approximately 6:50 p.m. that day. Appellant, who had scratches on his face, stated that his girlfriend had come over the previous evening and he had become "very intoxicated from drinking alcohol." He acknowledged that, in her confrontation call to him, his mother "had accused him of doing horrible things to her," but he claimed he could not remember what had happened. However, he also told the detective that his mother was "an honest woman," and he acknowledged that if she said "it happened," then the police could assume what she said was true.

When asked about the scratches on his face, Appellant stated that "they were probably from the struggle" with his mother, although he agreed it was possible that they were the

- 3 -

> result of "rough sex" with his girlfriend. At one point, Appellant appeared to concede that he "put his penis in [his mother's] mouth" and forced her to perform oral sex on him, which was what his girlfriend did when he could not get an erection. Appellant also indicated that he had tried to have vaginal sex with his mother, although he qualified this by adding "if that's what she is telling you." When asked "why he thought he did it," Appellant said it was "because of the things his mother had said to him." He stated that "he believed that he [had] done these things because he believed . . . what his mother said." Throughout the interview, however, Appellant neither fully admitted nor categorically denied having sexually assaulted his mother.
>
> Meanwhile, that same afternoon, the victim was interviewed by a registered nurse at Scottsdale Health Care as part of a forensic medical examination. The nurse carried out the interview with the assistance of a Spanish interpreter, who was available telephonically via a company called Cirricom, with which Scottsdale Health Care contracted for translation services. During the interview, the victim told the nurse that Appellant had gagged her and pushed her to the floor, twice attempted to penetrate her vaginally, and forced her to put his penis in her mouth.

(Doc. 17, Exh E at 2-6).

On direct review, Munoz raised three trial court errors: (1) admission of the victim's narrative statements pursuant to the excited utterance exception to the hearsay rule, (2) admission of the victim's statements through a Spanish interpreter when the interpreter did not testify and was not subject to cross-examination; and (3) denial of Munoz's motion for mistrial and/or to vacate the judgment after learning the victim had denied ever being restrained or raped (*Id.*, Exh F). The Arizona Court of Appeals affirmed Munoz's convictions and sentences (*Id.*, Exh E).

Munoz filed a Notice of Post-Conviction Relief, and appointed counsel subsequently notified the trial court that she had reviewed the record and had been unable to find any claims for relief (*Id.*, Exh H, I). Munoz filed a *pro se* petition, raising, inter alia, a claim of prosecutorial misconduct, and ineffective assistance of trial and appellate counsel (*Id.*, Exh K). The trial court found the claim of prosecutorial conduct precluded (*Id.*, Exh M). Regarding the claim of ineffective assistance of trial counsel, the trial court ruled as follows:

> Here, defendant claims that his trial counsel was ineffective for failing to challenge the indictment, failing to interview witnesses, and failing to file any pretrial motions. However, upon review of the indictment, that challenge would have failed. The defendant provides no explanation of why he knows who his attorney did or did not interview, nor how that would have affected the case. His attorney did a wonderful cross-examination of the witnesses in this case, was well prepared, and fought for his client. Similarly, defendant does not state which pretrial motion he thinks should have been filed. The record reflects that this court did have a pretrial hearing based on at least one pre-trial motion filed by defense counsel.

(*Id.*, Exh M).

Munoz petitioned for review in the court of appeals (*Id.*, Exh N). The court of appeals granted review but denied relief, finding that Munoz had not demonstrated that the trial court erred in finding his prosecutorial misconduct claim precluded or in its determination that the ineffective assistance claims were not colorable (*Id.*, Exh O). The court of appeals issued its mandate on November 29, 2012 (*Id.*, Exh P).

## EXHAUSTION OF REMEDIES

A state prisoner must exhaust his state remedies before petitioning for a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b)(1) & (c); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *McQueary v. Blodgett*, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-846 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999); *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). A claim has been fairly presented if the petitioner has described both the operative facts and the federal legal theory on which the claim is based. *Bland v. Cal. Dep't of Corrections*, 20 F.3d 1469, 1472-73 (9th Cir. 1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); *Tamalini*

1  *v. Stewart*, 249 F.3d 895, 898 -99 (9th Cir. 2001).  The exhaustion requirement will not be
2  met where the Petitioner fails to fairly present his claims.  *Roettgen*, 33 F.3d at 38.

3        If a petition contains claims that were never fairly presented in state court, the federal
4  court must determine whether state remedies remain available to the petitioner.  *See Rose v.*
5  *Lundy*, 455 U.S. 509, 519-20 (1982); *Harris v. Reed*, 489 U.S. 255, 268-270 (1989)
6  (O'Connor, J., concurring).  If remedies are available in state court, then the federal court
7  may dismiss the petition without prejudice pending the exhaustion of state remedies.  *Id.*
8  However, if the court finds that the petitioner would have no state remedy were he to return
9  to the state court, then his claims are considered procedurally defaulted.  *Teague v. Lane*, 489
10 U.S. 288, 298-99 (1989); *White v. Lewis*, 874 F.2d 599, 602-605 (9th Cir. 1989).  The federal
11 court may decline to consider these claims unless the petitioner can demonstrate that a
12 miscarriage of justice would result, or establish cause for his noncompliance and actual
13 prejudice.  *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Coleman v. Thompson*, 501 U.S.
14 722, 750-51 (1991); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*,
15 433 U.S. 72, 86 (1977); *United States v. Frady*, 456 U.S. 152, 167-68 (1982).

16       Further, a procedural default may occur when a Petitioner raises a claim in state court,
17 but the state court finds the claim to be defaulted on procedural grounds.  *Coleman*, 501 U.S.
18 at 730-31.  In such cases, federal habeas review is precluded if the state court opinion
19 contains a plain statement clearly and expressly relying on a procedural ground "that is both
20 'independent' of the merits of the federal claim and an 'adequate' basis for the court's
21 decision."  *See Harris*, 489 U.S. at 260.  A state procedural default ruling is "independent"
22 unless application of the bar depends on an antecedent ruling on the merits of the federal
23 claim.  *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Stewart v. Smith*, 536 U.S. 856
24 (2002).  A state's application of the bar is "adequate" if it is "'strictly or regularly followed.'"
25 *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255,
26 262-63 (1982)).  In cases in which a state prisoner has defaulted his federal claims in state
27 court pursuant to an independent and adequate state procedural rule, just as in cases

involving defaulted claims that were not fairly presented, federal habeas review of the claims is barred unless the prisoner can demonstrate a miscarriage of justice or cause and actual prejudice to excuse the default. *See Coleman*, 501 U.S. at 750-51.

"Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, ____U.S. ____, 132 S.Ct. 1309, 1315 (2012). A prisoner may show cause for default of an ineffective assistance claim by demonstrating that counsel at the initial-review collateral proceeding was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), and also by demonstrating that this claim of ineffective assistance of trial counsel is a substantial one, that the claim has merit. *Martinez*, 132 S.Ct. at 1318.

## DISCUSSION

In Ground One, Munoz argues that the prosecutor committed misconduct by failing to subpoena the victim for trial, by misleading counsel and the trial court as to the victim's whereabouts, and by offering false testimony. Munoz failed to raise this claim on appeal, and instead raised it for the first time in his petition for post-conviction relief. Because he failed to raise it on appeal, the trial court found the claim precluded. It is, therefore, unexhausted. *Coleman*, 501 U.S. at 730-31. In addition, the court of appeals ruled that Munoz did not properly present this claim for review because he had "largely incorporate[d] by reference the arguments made" in his post-conviction petition, in violation of Ariz.R.Crim.P. 32.9(c)(1)(iv). Therefore, his claim was also not fairly presented in the state court, and therefore unexhausted for this reason as well. *Swoopes*, 196 F.3d at 1010; *Bland*, 20 F.3d at 1472-73. In addition, Munoz would have no state remedy were he to return to the state court, making this claim procedurally defaulted. *Teague*. Munoz has not demonstrated a miscarriage of justice or cause and actual prejudice to excuse the default. *See Coleman*, 501 U.S. at 750-51.

In Ground Three, Munoz argues that the trial court lacked subject matter jurisdiction because the indictment cited criminal statutes, and not any specific criminal act. First,

1 Munoz was required to raise any alleged deficiencies in the indictment prior to trial. See
2 Ariz.R.Crim.P. 12.9, 13.5(e), 16.1(b). Munoz raised this claim of alleged deficiency in the
3 indictment in his post-conviction petition. The trial court correctly found the claim
4 precluded. However, in his petition for review, he raised it as a jurisdiction claim, which he
5 argued could be raised at any time. The court of appeals properly ruled that deficiencies in
6 the indictment are not jurisdictional and are "subject to waiver and, therefore, to preclusion,"
7 citing Ariz.R.Crim.P. 32.2(a)(3). The claim is therefore unexhausted. *Coleman*, 501 U.S. at
8 730-31. In addition, Munoz would have no state remedy were he to return to the state court,
9 making this claim procedurally defaulted. *Teague*. Munoz has not demonstrated a
10 miscarriage of justice or cause and actual prejudice to excuse the default. *See Coleman*, 501
11 U.S. at 750-51.

12 In Ground Two, Munoz alleges several instances of ineffective assistance of counsel.
13 In order to demonstrate ineffective assistance, Munoz must demonstrate that counsel's
14 actions fell below an objective standard of reasonableness and that he suffered prejudice as
15 a result. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Federal habeas review of a
16 § 2254 claim of ineffective assistance is "doubly deferential." *See Knowles v. Mirzayance*,
17 556 U.S. 111, 112 (2009). The question is whether the state court's application of the
18 *Strickland* standard was unreasonable, not whether counsel's performance fell below the
19 standards outlined in *Strickland*. See *Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770,
20 785 (2011). Because the state court record demonstrates that trial counsel's performance was
21 not deficient, we necessarily conclude that the state court reasonably applied the *Strickland*
22 standard.

23 Munoz first argues that counsel was ineffective for failing to (1) investigate the
24 whereabouts of the victim; (2) interview the victim; and (3) object to the prosecutor's
25 position that the victim's testimony would not be needed at trial. The exhibits Munoz filed
26 with his federal petition indicate that the prosecutor had a good-faith belief that the victim
27 was in Mexico. *See* Doc. 1 at 7. The victim's unavailability also explains why defense
28

- 8 -

1  counsel did not interview her, in addition to the fact that her rights as a victim may have
2  prohibited counsel from doing so. Defense counsel did not object to the prosecutor's position
3  that the victim's testimony would not be needed at trial because it would have been
4  overruled.  There is no constitutional requirement that the prosecutor call any particular
5  witness, only that the prosecutor prove every element of the offense beyond a reasonable
6  doubt. *See In Re Winship*, 397 U.S. 358, 361-62 (1970).  The victim's unavailability forced
7  the State to proceed to trial without her.

8  Munoz also argues that counsel was ineffective for failing to object to the sufficiency
9  of the indictment. The trial court properly concluded that such an objection would have been
10 futile, and counsel was therefore not deficient for failing to make the objection. *See Rupe*
11 *v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).  Munoz argues that counsel failed "to
12 investigate a favorable witness," without specifying who the witness is, what the witness
13 would have testified to, or how the witness's testimony would have aided his defense. *See*
14 *Ceja v. Stewart*, 97 F.3d 1246, 1255 (9th Cir. 1996).  Finally, Munoz argues that counsel
15 should have objected to the State's "continued [deliberate] attempts to influence the jury,"
16 but doesn't specify how the prosecutor was attempting to influence the jury. In Ground One,
17 Munoz argues that the prosecutor committed misconduct by failing to subpoena the victim
18 for trial, by misleading counsel and the trial court as to the victim's whereabouts, and by
19 offering false testimony. The victim wasn't subpoenaed because of the prosecutor's good-
20 faith belief that she was in Mexico. Therefore, he was not misleading the trial court as to her
21 whereabouts.  Finally, Munoz does not specify what false testimony was offered by the
22 prosecutor. Such objections, if made by counsel, would have been futile. *Rupe*, 93 F.3d at
23 1445.

24 **IT IS THEREFORE RECOMMENDED** that Jaime Perez Munoz's petition for writ
25 of habeas corpus be **denied and dismissed with prejudice** (Doc. 1).

26 **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave
27 to proceed *in forma pauperis* on appeal be **denied** either because dismissal of the Petition is

28
- 9 -

1  justified by a plain procedural bar and jurists of reason would not find the ruling debatable,
2  or because Munoz has not made a substantial showing of the denial of a constitutional right.
3        This recommendation is not an order that is immediately appealable to the Ninth
4  Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of
5  Appellate Procedure, should not be filed until entry of the district court's judgment. The
6  parties shall have fourteen days from the date of service of a copy of this recommendation
7  within which to file specific written objections with the Court. *See*, 28 U.S.C. § 636(b)(1);
8  Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen
9  days within which to file a response to the objections. Failure timely to file objections to the
10 Magistrate Judge's Report and Recommendation may result in the acceptance of the Report
11 and Recommendation by the district court without further review. *See United States v.*
12 *Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any
13 factual determinations of the Magistrate Judge will be considered a waiver of a party's right
14 to appellate review of the findings of fact in an order or judgment entered pursuant to the
15 Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.
16       DATED this 31st day of January, 2014.

_____
David K. Duncan
United States Magistrate Judge